# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 06-06525 |
| BACHRACH CLOTHING, INC., | ) | Hon. Pamela S. Hollis |
| | ) | Hearing Date:    June 20, 2006 |
| Debtor. | ) | Hearing Time:   10:00 a.m. |

## NOTICE OF MOTION

TO:    See Attached Service List

**PLEASE TAKE NOTICE** that on **June 20, 2006 at 10:00 a.m.** or as soon thereafter as counsel may be heard, I shall appear before the **Honorable Pamela S. Hollis,** Bankruptcy Judge, in the room usually occupied by her as a Courtroom in the U.S. Courthouse, 219 South Dearborn Street, Chicago, Illinois, or in her absence, before such other Judge who may be sitting in her place and stead and hearing bankruptcy motions, and shall then and there present the **Motion To Authorize (1) Bidding Procedures And Bid Protection, (2) Sale Of Substantially All Of The Debtor's Assets Free And Clear Of Liens, Claims And Interests, (3) Assumption And Assignment Of Related Executory Contracts And Unexpired Leases, (4) Store Liquidation Sales, And (5) Limitation Of Notice To Creditors With Respect Thereto,** a copy of which is attached and herewith served upon you, and shall pray for the entry of an order in conformity with the prayer of said pleading.

**AT WHICH TIME AND PLACE** you may appear if you so see fit.

Robert M. Fishman (#3124316)
Peter J. Roberts (#6239025)
Allen J. Guon (#6244526)
Shaw Gussis Fishman Glantz
  Wolfson & Towbin LLC
321 North Clark Street, Suite 800
Chicago, Illinois 60610
(312) 541-0151  telephone
(312) 980-3888  facsimile

## CERTIFICATE OF SERVICE

Peter J. Roberts certifies that he caused to be served a true copy of the above and foregoing notice and attached pleadings upon the attached Service List by first class mail unless otherwise indicated on this 13th day of June, 2006.

/s/ Peter J. Roberts

# BACHRACH CLOTHING, INC.
## SERVICE LIST and TOP 20 CREDITORS

Stephen G. Wolfe
Office of the U.S. Trustee
227 West Monroe Street, Suite 3350
Chicago, IL 60606
Phone:  312-886-7480
Fax:      312-886-5794

Donald Rothman
Riemer & Braunstein, LLP
Three Center Plaza, 6th Floor
Boston, MA  02108
Phone:  (617) 880-3556
Fax:      (617) 880-3456

John P. Sieger
Katten Muchin Rosenman LLP
525 West Monroe Street
Chicago, IL 60611-3969
Phone:  312-902-5294
Fax:      312-577-8681

Gerald Woelcke
Sun Bachrach, LLC
5200 Town Center Circle, Suite 470
Boca Raton, FL  33486
Phone:  (561) 962-3490
Fax:      (561) 394-0540

James A. Stempel
Kirkland & Ellis LLP
200 E. Randolph Dr.
Chicago, IL  60601
Phone:  (312) 861-2440
Fax:      (312) 861-2200

James Cullen
Alliance Management, Inc.
Carlson Towers, Suite 110
601 Carlson Pkwy.
Minneapolis, MN  55305
Phone:  (952) 475-2236

Sheila Arnold
Bachrach Clothing Inc.
610 Fairbanks Court, Third Floor
Chicago, IL  60611
Phone:  (312) 944-9988 , X154
Fax:      (217) 875-0030

Edgar H. Bachrach
1555 Astor Street
Chicago, IL  60610

Dennis B. Black
Keith A. Sigale
Goldberg Kohn Bell Black
    Rosenbloom & Moritz Ltd.
55 E. Monroe Street
Suite 3700
Chicago, IL  60603
Phone: (312) 201-4000
Fax:      (312) 332-2196

Lawrence C. Gottlieb
Kronish Lieb Weiner & Hellman LLP
1114 Avenue of the Americas
New York, New York  10036
Phone:  (212) 479-6140
Fax:      (212) 253-4108

Synde B. Keywell
Neal Gerber & Eisenberg LLP
Two North LaSalle Street
Suite 2200
Chicago, IL  60602-3801
Phone:  (312) 269-8003
Fax:      (312) 750-6437

Ms. Alisa Rothstein
57th & 5th
730 5th Ave. Ste.# 503
New York, NY 10019
Phone: (212) 842-9938
Fax:      (212) 765-1101

Ms. Rosa Desa
Neema
73 Gould St.
Bayonne, NJ  07002
Phone: (201) 858-2884
Fax:    (201) 858-0028

Ms. Madeline Dennis
Kellwood
2075 Quaker Point Dr.
Quakertown, PA  18951
Phone: (877) 675-8541
Fax:    (212) 329-3485

Ms. Victoria Burk
Maconde
80 West 40th St. - Ste.# 53
New York, NY 10018
Phone: (212) 575-3732
Fax:    (212) 575-3733

Mr. Jay Faris
Store Kraft
500 Irving St.
Beatrice, NE  68310
Phone: (402) 223-2348
Fax:    (402) 223-1268

Edward C. Dolan
Hogan & Hartson L.L.P.
Columbia Square
555 Thirteenth Street, NW
Washington, D.C. 20004-1109
Phone: (202) 637-5677
Fax:    (202) 637-5910
ecdolan@hhlaw.com

Jeffrey Kurtzman
Klehr, Harrison, Harvey,
Branzburg & Ellers LLP
260 S. Broad Street
Philadelphia, PA 19102
Phone: (215) 569-4493
Fax:   (215) 568-6603
jkurtzman@klehr.com

Simon Property Group, L.P.
Attn:  Ronald M. Tucker
115 West Washington Street
Indianapolis, IN 46204

Samuel B. Garber
Assistant General Counsel
General Growth Management, Inc., as Agent
110 North Wacker
Chicago, IL  60606
Phone: (312) 960-5079
Fax:    (312) 960-6373
sam.garber@generalgrowth.com

Internal Revenue Service
Mail Stop 5010 CHI
230 South Dearborn Street
Chicago, IL 60604

Associate Area Counsel, SB/SE
200 West Adams Street, Suite 2300
Chicago, IL 60606

Siemens Financial Services, Inc.
170 Wood Avenue South
Iselin, NJ 08830

## UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 06-06525 |
| BACHRACH CLOTHING, INC., | ) | Hon. Pamela S. Hollis |
| | ) | Hearing Date:  June 20, 2006 |
| Debtor. | ) | Hearing Time:  10:00 a.m. |

**MOTION TO AUTHORIZE (1) BIDDING PROCEDURES AND BID PROTECTION, (2) SALE OF SUBSTANTIALLY ALL THE DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND INTERESTS, (3) ASSUMPTION AND ASSIGNMENT OF RELATED EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (4) STORE LIQUIDATION SALES, AND (5) LIMITATION OF NOTICE TO CREDITORS WITH RESPECT THERETO**

Pursuant to 11 U.S.C. §§ 105(a), 363 and 365 and Fed. R. Bankr. P. 2002, 6004, 6006, 9006, 9007, and 9014, Bachrach Clothing, Inc. ("Debtor") hereby requests that this Court enter orders authorizing (i) bidding procedures and bid protection in connection with the Debtor's intended sale of substantially all of its assets; (ii) the sale of substantially all of the Debtor's assets free and clear of liens, claims and interests; (iii) the assumption and assignment of related executory contracts and unexpired leases; (iv) the execution of store liquidation sales to the extent necessary; and (v) limited notice with respect thereto.  In support of this Motion, the Debtor respectfully represents as follows:

## I.  INTRODUCTION

### A.  The Debtor's Chapter 11 Case

1.      On June 6, 2006 ("Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Since then, the Debtor has remained in possession of its assets and has continued to operate its business as a debtor in possession in accordance with 11 U.S.C. §§ 1107 and 1108.  The Debtor has all of the rights and powers of a trustee in bankruptcy pursuant to 11 U.S.C. § 1107(a).

2.      On June 12, 2006, the Office of the United States Trustee appointed an official committee of unsecured creditors ("Committee") in the Debtor's case.

3.      This Court has jurisdiction to hear this matter and enter a final order granting the relief requested herein pursuant to 28 U.S.C. §§ 1334 and 157(b)(2) and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois.

### B.      The Debtor's Business and Events Leading To Chapter 11

4.      The Debtor is a privately held Illinois corporation with its corporate headquarters located in Chicago.  With 47 retail stores located throughout the United States and a primary cluster of stores located in the Midwest, the Debtor is a high-end specialty men's clothing merchandiser.  In addition to its retail store operations, the Debtor also operates a catalog and internet business.  In 2005, the Debtor generated total revenues of approximately $81 million.

5.      Founded in 1877, the Debtor's operations grew from a single store in Decatur, Illinois to a peak of 79 stores nationwide under a prior ownership group.  However, the Debtor's expansion proved too aggressive.  The expansion extended to underperforming markets, and it caused the Debtor to develop substantial inventory management problems which were exacerbated by the lack of a disciplined budgetary planning system among the stores and an appropriately defined marketing plan.  Despite more recent efforts to divest itself of underperforming stores and restructure its operations, the Debtor has continued to generate poor financial results and negative cash flow.  A disproportionate cost structure and substantial capital improvements over the past few years have substantially contributed to the Debtor's financial difficulties.  Due to these and other conditions, the Debtor's financial strength has deteriorated, and its operating flexibility has eroded accordingly.

6.      Although the Debtor has explored other restructuring and financing alternatives, it ultimately decided to sell its assets through a bankruptcy.  The Debtor believes that the chapter

11 process provides the most efficient platform to maximize the value of its assets through competitive bidding procedures, the relief available under 11 U.S.C. § 365, and the protection that buyers will be afforded under 11 U.S.C. § 363.

**C.    The Debtor's Prepetition Lenders**

7.    Prior to the Petition Date, the Debtor financed its operations through a revolving credit facility established pursuant to a loan and security agreement (as amended, the "LaSalle Prepetition Credit Agreement") with LaSalle Retail Finance, a Division of LaSalle Business Credit LLC ("LaSalle"). The Debtor pledged all or substantially all of its assets as security under the LaSalle Prepetition Credit Agreement. As of the Petition Date, the principal balance that the Debtor owed under the LaSalle Prepetition Credit Agreement was approximately $4,900,000, plus any amounts owed in connection with outstanding letters of credit issued by LaSalle for the Debtor's benefit.

8.    In addition to its LaSalle secured obligations, as of the Petition Date, the Debtor also owed approximately $5,000,000, plus interest, fees and costs, on a secured basis, to Sun Bachrach LLC ("Sun Bachrach").[1] Sun Bachrach is the assignee of Harris N.A. ("Harris") in connection with a certain loan authorization agreement between Harris and the Debtor dated as of July 12, 2005 (as amended, the "Harris Loan Agreement") and whereby Harris made a $2 million secured loan to the Debtor. On or about March 3, 2006, Sun Bachrach made an additional $3 million advance to the Debtor pursuant to the Harris Loan Agreement. The Debtor pledged all or substantially all of its assets as security under the Harris Loan Agreement. Sun

---

[1]Sun Bachrach is the 92.5% shareholder of Bachrach Clothing Holding Corp. ("BCHC"). BCHC is the 100% shareholder of the Debtor. In addition to Sun Bachrach's $5 million (in principal) secured claim against the Debtor, Sun Bachrach holds an additional unsecured claim against the Debtor in the principal amount of $1.5 million.

Bachrach's secured claim is subject to a certain Subordination Agreement ("Intercreditor Agreement") among the Debtor, LaSalle (as Agent), Harris, and BCHC.

### D.      The Debtor's Use Of Cash Collateral

9.      Subject to the terms of an interim Cash Collateral Order entered on June 8, 2006 and the Budget attached thereto, the Debtor has negotiated the consensual use of the cash collateral of LaSalle and Sun Bachrach (collectively, the "Prepetition Lenders"). The Debtor intends to use the cash collateral to operate its business in the ordinary course and to facilitate the sale of its business. One of the material conditions of the Prepetition Lenders' consent to the use of cash collateral was the Debtor's commitment that it would endeavor to sell its assets expeditiously and to prosecute the appropriate motions before this Court in order to obtain the appropriate authority to close such a sale.

## II.  PROPOSED SALE OF DEBTOR'S ASSETS

### A.      Overview of Proposed Sale Process

10.      As stated above, the Debtor has experienced significant financial difficulties. After consultation with its business and financial advisors and after having approached possible sources of capital, the Debtor has determined that it is unable to obtain the necessary funding to restructure its affairs as an operating entity. The Debtor has therefore determined, in the exercise of its business judgment, that the best mechanism for maximizing asset value for the benefit of its estate and creditors is through an expeditious sale of substantially all of its assets and its business ("Assets") through one or more transactions.

11.      Consequently, the Debtor requests authority to sell its Assets free and clear of liens, claims and other interests. As detailed below, the Debtor has commenced the process of offering its Assets for sale both as a going concern and through store closing and liquidation sales. Specifically, the Debtor has solicited bids for possible sale transactions using proposed

forms of (i) an asset purchase agreement (the "Asset Purchase Agreement") for a sale of the Debtor's Assets on a going concern basis ("GC Sale"), and (ii) an agency agreement ("Agency Agreement") for liquidation sales of the Debtor's Assets ("Liquidation Sale," and together with the GC Sale, the "Sales"). The Asset Purchase Agreement and the Agency Agreement, which are respectively attached hereto as Exhibits 1 and 2, are tailored for that purpose.

12.    Through this Motion, the Debtor requests the entry of an order, substantially in the form of preliminary order attached hereto as Exhibit 3 (the "Preliminary Order"), approving the bidding procedures attached hereto as Exhibit 4 (the "Bidding Procedures"), and authorizing bid protection (the "Bid Protection") for its proposed sales of the Assets as described herein, and allowing associated preliminary relief in accordance with this Motion. Additionally, the Debtor requests that this Court schedule a hearing (the "Sale Hearing") to approve Sales of the Debtor's Assets pursuant to this Motion and the Bidding Procedures. The Debtor requests that the Court enter an order or orders at the Sale Hearing in applicable variations of the forms attached hereto as Group Exhibit 5 (the "Sale Order"): (a) authorizing the Debtor to sell its Assets free and clear of all liens, claims and interests on substantially the terms and conditions set forth in negotiated forms of the Asset Purchase Agreement(s) and/or the Agency Agreement; (b) authorizing the Debtor to (i) assume any applicable executory contracts and unexpired leases (the "Designated Agreements"), (ii) assign the Designated Agreements to the purchaser(s) or the successful bidder(s), and (iii) pay the amounts, if any, necessary to cure existing defaults or arrearages under the Designated Agreements, all as subject to the assumption and assignment procedures detailed below; and (c) authorizing the Debtor to conduct any applicable Liquidation Sales.

13.    As described in more detail below, the proposed sales process contemplates the consummation of one or more Sales of the Debtor's Assets within a relatively short time frame.

In particular, the Debtor has determined, in the exercise of its business judgment, that the value of its estate will be maximized if Sales are authorized by this Court by the end of June.

     **B.**      **<u>Bidding Procedures, Bid Protection, Asset Purchase and Agency Agreements</u>**

14.     The Debtor is in the midst of discussions with various potential purchasers and liquidation agents, but it has not yet reached a definitive agreement with any potential purchaser or agent regarding the terms of a particular Sale.  In order to facilitate the sales process, the Debtor, in consultation with its business and financial advisors, has designed the Bidding Procedures, Bid Protection, Asset Purchase Agreement and Agency Agreement for use in connection with one or more Sales.

15.     As described in more detail in the Bidding Procedures, the Debtor intends to offer its Assets for sale through two separate but simultaneous devices.  The Debtor intends to offer substantially all of its Assets in a GC Sale.  At the same time, but subject to the GC Sale, the Debtor also intends to offer its Assets in a Liquidation Sale.  The Asset Purchase Agreement is designed to accommodate a GC Sale, and the Agency Agreement is designed to accommodate a Liquidation Sale.

16.     Although the Debtor currently intends to offer its Assets and business for sale through either a GC Sale or through a Liquidation Sale, the Debtor also reserves the right in the Bidding Procedures to offer its Assets in such combinations of the two as the Debtor determines, in the exercise of its business judgment, after consultation with the Prepetition Lenders and the Committee, will result in the highest or otherwise best collective value for its Assets.

17.     As set forth more specifically in the Bidding Procedures, in order to participate in the sales process, each potential bidder (a "Potential Bidder") must (i) satisfy the Debtor (in consultation with the Prepetition Lenders and the Committee) that it has the financial capability to consummate the cash purchase of the Assets, or the applicable portion thereof, and that it is

reasonably likely that the Potential Bidder will be able to consummate a purchase of the Assets,

or the applicable portion thereof, (ii) have tendered its bid in the form of (A) a marked up Asset

Purchase Agreement for any GC Sale bids, or (B) a marked up Agency Agreement for any

Liquidation Sale bids, and (iii) submitted a good faith cash deposit (the "Good Faith Deposit") in

an amount equal to 15% of its bid.  In order for a Potential Bidder to have its bid considered for

any Bid Protection (as described below), its financial information, bid and Good Faith Deposit

(collectively, "Bid Submissions") must be made no later than 4:00 p.m. (CDT) on June 16, 2006

(the "Stalking Horse Bid Deadline").  Otherwise, in order to bid at the Debtor's intended auction

of the Assets ("Auction"), a Potential Bidder must submit its Bid Submissions no later than 4:00

p.m. (CDT) on June 26, 2006 (the "Bid Deadline").

18.     Under the Bidding Procedures, the Debtor shall determine whether a Potential

Bidder is a "Qualified Bidder" and then intends to notify Potential Bidders of its determination

prior to the scheduled Auction.  The Debtor intends to make that determination, in consultation

with the Prepetition Lenders and the Committee, after considering whether each Potential Bidder

is reasonably likely (based on availability of financing, experience and other considerations) to

submit a bona fide offer and to be able to consummate a Sale if selected as the successful bidder.

19.     In order to induce a Potential Bidder to make a Qualified Bid prior to the Stalking

Horse Deadline that is subject to no contingencies other than (a) Court approval of the offer, and

(b) the Debtor's continuation of material operations through closing (such a Qualified Bid, a

"Firm Offer"), the Debtor also requests authority to offer bid protection with the consent of the

Prepetition Lenders but otherwise in its sole discretion.  Specifically, the Debtor requests

authority to offer a termination or break-up fee, expense reimbursement or other incentives

(collectively, "Bid Protection") to induce a Firm Offer; provided, however, that in no event shall

Bid Protection be offered for more than one GC Sale and one Liquidation Sale.  Further, such Bid Protection shall only be payable if a higher or otherwise better offer from another bidder results in a closed transaction and the party to whom such Bid Protection was provided was not in default of any of its obligations and was otherwise ready, willing and able to close on its proposed transaction.  Moreover, no party will be entitled to Bid Protection without a written agreement ("Stalking Horse Bid") signed by the Debtor and the Qualified Bidder which agreement explicitly sets forth the terms of the applicable Qualified Bid and Bid Protection.  In order for any Qualified Bid made at the Auction to be considered superior to a Stalking Horse Bid, such Qualified Bid will have to exceed the Stalking Horse Bid by an amount greater than the applicable Bid Protection.

20.    After all Qualified Bids have been received, the Debtor intends to conduct an auction (the "Auction") with respect to the Assets.  Subject to Court approval, the Auction shall take place at 11:00 a.m. (CDT) on June 29, 2006 at the offices of Shaw Gussis Fishman Glantz Wolfson & Towbin LLC, 321 North Clark Street, Chicago, Illinois, or such later time or other place as the Debtor shall notify all Qualified Bidders who have submitted Qualified Bids.  Based upon the terms of the Qualified Bids received prior to the Auction, the level of interest expressed as to particular Assets on the basis of both a GC Sale and a Liquidation Sale, and such other information as the Debtor determines is relevant, the Debtor, in its sole discretion, will conduct the Auction in the manner and in the order that it determines will result in the highest or otherwise best offer for the Assets.  In addition, the Debtor may, in consultation with the Prepetition Lenders and the Committee, entertain Qualified Bids for all or a portion of its Assets.

21.    Upon the Auction's conclusion, the Debtor, in consultation with its advisors and representatives of the Prepetition Lenders and the Committee, shall (i) review each Qualified Bid

or Bids, as augmented at the Auction, on the basis of financial and contractual terms and the

factors relevant to the Sale process, including those factors affecting the speed and certainty of

consummating the Sale and the applicability of any Bid Protection and its impact on the net

recovery to the Debtor's estate, and (ii) identify the highest and otherwise best offer, or group of

offers, for the Assets (the "Successful Bid(s)").  The Successful Bid(s) may take the form of a

GC Sale, a Liquidation Sale, or a combination of the two.

22.     The Debtor may also select, on the same basis, the next highest or otherwise best

bids for the Assets ("the Second Best Bid(s)").  Upon a failure to consummate the Sale because

of a breach or failure on the part of the holder of the Successful Bid(s), the Debtor, in

consultation with the Prepetition Lenders and the Committee, may deem the Second Best Bid(s)

to be the Successful Bid(s) without further auction or order of the Court.  At the Sale Hearing,

the Debtor shall present the Successful Bid(s) and the Second Best Bid(s) to this Court for

authorization.  Because the underlying agreements for such Bid(s) will be negotiated at arm's-

length and tempered by competitive bidding at the Auction, the Debtor will also request a finding

that the holders of the Successful Bid(s) and the Second Best Bid(s) acted in good faith within

the meaning of 11 U.S.C. § 363(m) and are consequently entitled to all of its protections.

### C.     Applicable Legal Authority For Proposed Sale(s)

(i)     Sales Outside The Ordinary Course Of Business

23.     Section 363 of the Bankruptcy Code provides that the Debtor, "after notice and a

hearing, may use, sell or lease, other than in the ordinary course of business, property of the

estate."  See 11 U.S.C. § 363(b).  To approve the use, sale or lease of property outside the

ordinary course of business, this court need only determine that the Debtor's decision is

supported by "some articulated business justification."  *See, e.g., Fulton State Bank v. Schipper*,

933 F.2d 513, 515 (7th Cir. 1991); *Committee of Equity Sec. Holders v. Lionel Corp. (In re*

*Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *see also Stephens Ind., Inc. v. McClung*,

789 F.2d 386, 389-90 (6th Cir. 1986); *In re Abbott Dairies of Pa., Inc.*, 788 F.2d 143, 145-47 (3d

Cir. 1986); *In re Telesphere Communications, Inc.*, 179 B.R. 544, 552 (Bankr. N.D. Ill. 1999); *In*

*re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991).

24.    Once the Debtor articulates a valid business justification, "[t]he business

judgment rule 'is a presumption that in making a business decision the directors of a corporation

acted on an informed basis, in good faith and in the honest belief that the action was in the best

interests of the company.'" *In re S.N.A. Nut Company*, 186 B.R. 98 (Bankr. N.D. Ill. 1995); *In*

*re Integrated Resources. Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992); *In re Johns-Manville Corp.*,

60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a

Debtor's management decisions.").

25.    Indeed, when applying the "business judgment" rule, courts show great deference

to the debtor's decision-making. *See Summit Land Co. v. Allen (In re Summit Land Co.)*, 13 B.R.

310, 315 (Bankr. D. Utah 1981).  Accordingly, this court should grant the relief requested in this

Motion if the Debtor demonstrates a sound business justification therefor.  *See Schipper*, 933

F.2d at 515; *In re Lionel Corp.*, 722 F.2d at 1071; *In re Delaware Hudson Ry. Co.*, 124 B.R. 169

at 179.

26.    As explained above, the Debtor has a sound business justification for selling

substantially all its Assets at this time.  The Debtor simply lacks the financial resources and

access to capital necessary to fund its operations for a prolonged period.  Indeed, the consent of

the Prepetition Lenders to the Debtor's use of cash collateral is expressly based upon the

Debtor's commitment to obtain authorization from this Court to sell the Assets by the end of

June.  While the Debtor's operations are continuing during that timeframe, the Debtor has a

small window of opportunity to maximize the value of its Assets through a GC Sale or alternatively, through a Liquidation Sale. For this reason, the Debtor has determined, in the exercise of its business judgment, that the most viable option for maximizing the value of its estate is through one or more Sales of its Assets in the manner and in the timeframe set forth in the Bidding Procedures. Its request for approval to sell the Assets in accordance with the Bidding Procedures should be allowed accordingly.

(ii)    <u>Proposed Bid Protection</u>

27.    In order to induce potential purchasers of the Assets to spend the time, energy, and resources necessary to submit a Firm Offer that the Debtor can use as a minimum or "stalking horse" bid at the Auction, the Debtor has requested authority to offer Bid Protection as stated above. The Debtor believes that a compelling need exists to authorize the Bid Protection in order to induce parties to submit the first bid or bids for the Assets within the time frame mandated by the Debtor's business circumstances. Moreover, the Debtor believes that the proposed Bid Protection will benefit its estate by providing an incentive to potential purchasers to expend the resources necessary to formulate offers for the Assets.

28.    Break-up fees such as those included in any contemplated Bid Protection are "an incentive payment to a prospective purchaser with which a company fails to consummate a transaction." *In re S.N.A. Nut Company*, 186 B.R. 98, 101 (Bankr. N.D. Ill. 1995). "Agreements to provide breakup fees or reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers."' *Id.; see also In re 995 Fifth Ave. Associates, L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (bidding incentives may "be legitimately necessary to convince a

white knight to enter the bidding by providing some form of compensation for the risks it is undertaking").

29.     In the bankruptcy context, the test for determining whether a proposed break-up fee should be approved is whether it is in the best interests of the estate. *Id.* at 104; *see also In re America West Airlines, Inc.*, 166 B.R. 908 (Bankr. D. Ariz. 1994); *In re Hupp Industries, Inc.*, 140 B.R. 191 (Bankr. N.D. Ohio 1992).  In particular, there must be compelling circumstances "which clearly indicate that payment of the fee would be in the best interests of the estate." *S.N.A. Nut Company*, 186 B.R. at 105.

30.     The Debtor believes that the proposed Bid Protection satisfies this standard.  The primary circumstance compelling allowance of the Bid Protection is to entice Firm Offers for the Debtor's Assets as quickly as possible so that a transaction or group of transactions can be consummated while the Debtor continues to operate as a going concern.  There are "safeguards beneficial" to the Debtor's estate insofar as (i) the Debtor will retain the discretion to determine who may receive the benefit of Bid Protection and in what amounts, and (ii) the Bid Protection will be awarded only if the Debtor closes a transaction on a competing bid that covers the amount of Bid Protection offered.  *Id.* at 103, n.5 (denying break-up fee in the absence of any consummated sale).

31.     The Debtor's ability to offer the Bid Protection enables it to ensure the Sale of the Assets to contractually committed bidders at prices it believes to be fair, while providing the Debtor with the potential of even greater benefit to the estate through higher bids.  The Bid Protection should be approved accordingly.

(iii)    <u>Sales Free and Clear of Liens, Claims and Interests</u>

32.    Under § 363(f) of the Bankruptcy Code, a debtor in possession may sell property

free and clear of any lien, claim, or interest in such property if, among other things:

      (1)     applicable nonbankruptcy law permits sale of such property
free and clear of such interest;

      (2)     such entity consents;

      (3)     such interest is a lien and the price at which such property
is sold is greater than the aggregate value of all liens on
such property;

      (4)     such interest is in bona fide dispute; or

      (5)     such entity could be compelled, in a legal or equitable
proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

33.    Because section 363(f) is drafted in the disjunctive, the Debtor's satisfaction of

any one of its five requirements will be sufficient to permit the sale of the Assets free and clear

of liens, claims and other interests (collectively, the "Interests").  The Debtor believes that the

primary entities holding liens on the Assets are the Prepetition Lenders.[2]  The Prepetition

Lenders have supported the sales process, and the Debtor is reasonably confident that it will

---

    [2] Edgar H. Bachrach, in his capacity as collateral agent ("Subordinated Agent"), also
holds a subordinated security interest in the Debtor's assets to secure a subordinated promissory
note of the Debtor's parent, BCHC, in the principal amount of $4,000,000.00.  Under the
applicable terms of the subordination, however, the Subordinated Agent is, among other things,
specifically restricted from seeking adequate protection of his interests in the Debtor's property
pursuant to §§ 361, 362 or 363 of the Bankruptcy Code.  Even if the Subordinated Agent were
not so restricted, the Debtor asserts that he would nevertheless not be entitled to challenge the
Debtor's intended Sale of the Assets due to the exhaustion of any value to those interests as a
result of the senior security interests and liens of the Prepetition Lenders.

obtain any necessary consent on or before the Sale Hearing and will thereby satisfy the requirements of § 363(f)(2).[3]

34.     Moreover, all holders of Interests, including the Prepetition Lenders, can be compelled to accept a money satisfaction of such Interests in legal or equitable proceedings in accordance with § 363(f)(5). Such legal or equitable proceedings include proceedings to confirm a plan of reorganization, under which the holder of a lien may be compelled to accept payment in satisfaction of its lien pursuant to 11 U.S.C. § 1129(b)(2)(A).

35.     Indeed, § 1129(b)(2)(A) specifically allows a debtor in possession to sell property subject to a lien, free and clear of such lien, if such lien attaches to the net proceeds of the sale, subject to any claims and defenses the debtor may possess with respect thereto. The Debtor proposes that any Interests in the Assets attach to the net proceeds of the Sale(s) in this case.

### III.  PROPOSED ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

#### A.     Proposed Assumption and Assignment Procedure

36.     As part of this Motion, the Debtor seeks authority to assume and assign certain agreements and leases to the Successful Bidder(s) or the Second Best Bidder(s) to the extent necessary. The Debtor particularly anticipates the need for such authority in connection with any GC Sale transaction. Because of the need to close any such transaction as quickly as possible in order to maximize value of the Assets, the Debtor proposes the following procedures for

---

[3] To the extent that any other entity asserts a lien on the Assets, the Debtor requests approval of this Motion under 11 U.S.C. § 363(f)(1) and (f)(3). The Prepetition Lenders hold first priority security interests in substantially all of the Debtor' property, including the Assets. Those security interests (i) completely exhaust the value of the Assets, and (ii) could be satisfied through a sale of the Assets free and clear of any junior liens under applicable nonbankruptcy law.

assuming and assigning agreements and leases included in the Successful Bid(s) and the Second Best Bid(s).

     37.    On or before the third business day after conclusion of the Auction, the Debtor shall send a notice (the "Assignment Notice") by overnight delivery to each non-Debtor party to the executory contracts and unexpired leases ("Designated Agreements") that the Debtor proposes to assume and assign in connection with any proposed Sale transaction(s).   The Assignment Notice shall (i) identify each Designated Agreement; (ii) describe the basis for the Debtor's belief that there is adequate assurance of the future performance of the Successful Bidder(s) and any Second Best Bidder(s) under such Designated Agreement; (iii) state the cure amounts, if any, that the Debtor believes are necessary to satisfy in order to assume such Designated Agreement pursuant to 11 U.S.C. § 365 (the "Cure Amount"); and (iv) state a deadline ("Assignment Objection Deadline") by which non-Debtor parties to Designated Agreements must file any objection to the proposed assumption and assignment of such Designated Agreements, including any objection to the applicable Cure Amounts.  At a hearing not later than eight business days following the Auction as the Court's calendar may permit ("Assignment Hearing"), the Debtor shall request the entry of an order requesting authority to assume and assign any Designated Agreements to the Successful Purchaser(s) or the Second Best Bidder(s) subject to the actual closing of an applicable Sale transaction.  The Debtor requests that the Court set the Assignment Objection Deadline two business days prior to  the Assignment Hearing.  Any non-Debtor party that is served with an Assumption Notice shall be entitled to appear at the Assignment Hearing and object to the proposed assumption and assignment of its Designated Agreement.  The Assumption Notice shall be provided at least five business days prior to the Assignment Hearing.

**B.**    **Applicable Legal Authority For Proposed Assumption And Assignment**

38.    As a debtor in possession, the Debtor has the right, subject to court approval, to assume any executory contracts or unexpired leases. *See* 11 U.S.C. § 365(a). The assumption of an unexpired lease by a debtor in possession is subject to review under the business judgment standard. If such business judgment has been reasonably exercised, a court should approve the assumption. *See, e.g., NLRB v. Bildisco and Bildisco*, 465 U.S. 513, 523 (1984); *Sharon Steel Corp. v. National Fuel Gas Distribution*, 872 F.2d 36, 39-40 (3d Cir. 1989); *In re RLR Celestial Homes, Inc.*, 109 B.R. 36, 46 (Bankr. S.D.N.Y. 1989).

39.    Section 365(b)(1) of the Bankruptcy Code sets forth the requirements for assumption. This subsection provides as follows:

> (b) (1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—

>> (A)    cures, or provides adequate assurance that the trustee will promptly cure, such default other than a default that is a breach of a provision relating to the satisfaction of any provision (other than a penalty rate or penalty provision) relating to a default arising from any failure to perform nonmonetary obligations under an unexpired lease of real property, if it is impossible for the trustee to cure such default by performing nonmonetary acts at and after the time of assumption, except that if such default arises from a failure to operate in accordance with a nonresidential real property lease, then such default shall be cured by performance at and after the time of assumption in accordance with such lease, and pecuniary losses resulting from such default shall be compensated in accordance with the provisions of this paragraph;

>> (B)    compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

>> (C)    provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

40. The requirement of "adequate assurance of future performance" also applies when assumption is coupled with an intended assignment. Section 365(f)(2) of the Bankruptcy Code provides that:

> [t]he trustee may assign an executory contract or unexpired lease of the debtor only if --
>
> (A)   the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B)   adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

41. The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction." *See, e.g., EBG Midtown South Corp. v. McLaren/Hart Env. Engineering Corp. (In re Sanshoe Worldwide Corp.)*, 139 B.R. 585, 593 (S.D.N.Y. 1992); *In re Prime Motor Inns Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994) ("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance"); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

42. Among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g., In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

43.     In the exercise of its business judgment, the Debtor intends to assume and assign the Designated Agreements as may be necessary to maximize the value of its Assets for anticipated Sale(s).  To the extent that any defaults exist under any Designated Agreement that is to be assumed and assigned in connection with the Sale(s) of any Assets, the Debtor will cure any such default prior to such assumption and assignment.  Moreover, the Debtor will adduce facts at the Assignment Hearing demonstrating the financial wherewithal of the applicable Successful Bidder(s) and the Second Best Bidder(s), their experience in the industry, and their willingness and ability to perform under the Designated Agreements to be assumed and assigned.

44.     The Assignment Hearing therefore will provide the court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of the Successful Bidder(s) and the Second Best Bidder(s) to provide adequate assurance of future performance under the Designated Agreements.  The Court therefore should have a sufficient basis to authorize the Debtor to assume and assign those Designated Agreements.

## IV.   PROPOSED PROCEDURES FOR THE CONDUCT OF LIQUIDATION SALES

### A.     Proposed Liquidation Sales

45.     To the extent that the Debtor selects any Successful Bid(s) or Second Best Bid(s) tendered on the basis of a Liquidation Sale, the Debtor requests authority to enter into an Agency Agreement with the holder of such Successful Bid(s) or Second Best Bid(s) ("Store Liquidation Agent(s)") to act as the Debtor's agent for the purpose of conducting inventory liquidation sales at the applicable stores of the Debtor.  The use of a Store Liquidation Agent will mitigate much of the execution risk associated with the conduct of closing those stores and liquidating associated inventory.  For example, as provided under the proposed form of Agency Agreement attached hereto, the Store Liquidation Agent typically guarantees a minimum recovery for the applicable merchandise (with a profit sharing potential for the Debtors over a threshold recovery

amount), pays the operating expenses during the course of the sales, and manages the conduct of the sales.

46.     The disposition of merchandise pursuant to terms and procedures substantially similar to those set forth in the Agency Agreement represents an accepted method for the sale of retail merchandise in a bankruptcy, and it has been approved accordingly in numerous chapter 11 retail cases.  As set forth in the § 8.1 of the Agency Agreement, the Debtor anticipates the establishment of guidelines ("Store Liquidation Guidelines") for the conduct of the Liquidation Sales to ensure compliance with applicable public heath and safety laws and to balance the interests of affected landlords.

### B.    <u>Invalidation Of Contractual Restrictions On Liquidation Sales</u>

47.     The Debtor leases all of its store locations.  Thus, any contemplated Liquidation Sales may be inconsistent with certain provisions of applicable leases or other agreements ("Anti-Alienation Provisions") whether or not filed of record with respect to any of the Debtors' premises (the "Premises").   Such Anti-Alienation Provisions include, without limitation, reciprocal easement agreements, agreements containing covenants, conditions and restrictions (including, without limitation, "go-dark" provisions), or other similar documents or provisions (collectively, the "Restrictive Documents"), with respect to the Premises that are intended to protect the image of a shopping center or mall or avoid disruption of normal commerce, including Anti-Alienation Provisions purporting to restrict or prohibit the Debtor from conducting store closing, going out of business, inventory liquidation or similar sales.  Such Anti-Alienation Provisions in leases have been deemed unenforceable in other chapter 11 cases as impermissible restraints on a debtor's ability to maximize the value of its assets under section 363 of the Bankruptcy Code.  *See In re Ames Dep't Stores, Inc*., 136 B.R. 357, 359 (Bankr.

S.D.N.Y. 1992) (enforcement of anti-going-out-of-business sales clause would contravene overriding federal policy requiring debtors to maximize assets); *see also In re Tobago Bay Trading Co.*, 112 B.R. 463, 467 (Bankr. N.D. Ga. 1990) (anti-going-out-of-business sales clause in lease is unenforceable); *In re Lisbon Shops, Inc.,* 24 B.R. 693, 695 (Bankr. E.D. Mo. 1982) (same).

48.     Through the Store Liquidation Guidelines outlined above, the Debtor proposes to conduct the Liquidation Sales in a manner that balances the rights of landlords to maintain the integrity of their properties with the rights of the Debtor to maximize recoveries from liquidation sales for the benefit of its estate.  Thus, any potential prejudice to landlords is ameliorated by the implementation of the Store Liquidation Guidelines.

49.     In any event, store closing, going out of business or liquidation sales, such as the Liquidation Sales contemplated and described herein, are a routine part of chapter 11 cases involving retail debtors, especially store chains.  Such sales are consistently approved by courts, despite provisions of recorded documents or agreements purporting to forbid such sales in the ordinary course of business.  *See, e.g., In re R.H. Macy & Co.*, 170 B.R. 69,77 (Bankr. S.D.N.Y. 1994); *Ames Dep't Stores*, 136 B.R. at 359 (finding that "to enforce the anti-GOB sale clause of the (i) lease would contravene overriding federal policy requiring Debtors to maximize estate assets by imposing additional constraints never envisioned by Congress"); *In re Tobago Bay*, 112 B.R. at 465-66; *In re Libson Shops, Inc.,* 24 B.R. 693, 695 (Bankr. E.D. Mo. 1982).

50.     Thus, the Court should ensure that no clause in any of the Restrictive Documents for the Premises is an impediment to the Liquidation Sales or the activities connected therewith.  To the extent such Anti-Alienation Provisions exist in any Restrictive Documents, they should

not be permitted to interfere with, or otherwise restrict the Debtor or the Store Liquidation Agent

from conducting the Liquidation Sales or the closing of applicable stores of the Debtor.

### C.   Requested Exemption From Otherwise Restrictive Non-Bankruptcy Laws

51.     Certain states in which the Debtor's stores are located have or may have licensing

and other requirements governing the conduct of store closing, liquidation or other inventory

clearance sales, including, but not limited to state and local statutes and regulations establishing

licensing or permitting requirements, waiting periods, time limits, bulk sale restrictions, and

augmentation limitations that would otherwise apply to the Liquidation Sales or consumer fraud

laws, with the exception of deceptive advertising laws, (the "Liquidation Sale Laws").  Typical

statutes and regulations provide that if a liquidation or bankruptcy sale is court authorized,

however, then a company need not comply with these Liquidation Sale Laws.  Nevertheless,

pursuant to 11 U.S.C. §§ 105(a) and 363(b), this Court has the authority to permit the

Liquidation Sales to proceed notwithstanding contrary Liquidation Sale Laws.  The Debtor,

therefore, requests that, pursuant to 11 U.S.C. §§ 105(a) and 363(b), this Court authorize the

Debtor to conduct the Liquidation Sales without the necessity of, and the delay associated with,

complying with the Liquidation Sale Laws.

52.     Because the Debtor and its Assets are subject to this Court's jurisdiction, this

Court will be able to supervise the conduct of the Liquidation Sales.  The Liquidation Sales are a

legitimate method by which the Debtor can maximize the return from the sale of Assets for the

benefit of its estate and creditors.  Accordingly, this Court should dispense with any requirement

that the Debtor comply with technical requirements that are not intended to curtail liquidation or

store closing sales with the benefit of bankruptcy court supervision.

53.     Even if a state or local law does not expressly except bankruptcy sales from its scope, the Debtor submits that, to the extent such state or local law conflicts with federal bankruptcy laws, it is preempted by the Supremacy Clause of the United States Constitution.  To hold otherwise would severely impair the relief otherwise available under 11 U.S.C. § 363.   In accordance with this premise, bankruptcy courts have consistently recognized that federal bankruptcy law preempts state and local laws that contravene the underlying policies of the Bankruptcy Code.  *See, e.g., In re Shenango Group, Inc.*, 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995) ("Trustees and debtors-in-possession have unique fiduciary and legal obligations pursuant to the bankruptcy code. . . . [A] state statute [] cannot place burdens on them where the result would contradict the priorities established by the federal bankruptcy code.").  While preemption of state law is not always appropriate, as where the protection of public health and safety is involved, *see In re Baker & Drake*, 35 F.3d 1348, 1353-54 (9th Cir. 1994) (finding no preemption where state law prohibiting taxicab leasing was promulgated in part as a public safety measure), it is appropriate where, as here, the only state laws involved concern economic regulation.  *Id*. at 1353 (finding that "federal bankruptcy preemption is more likely . . . where a state statute is concerned with economic regulation rather than with protecting the public health and safety").

54.     Section 363 of the Bankruptcy Code is premised upon a debtor's use and sale of its assets in a manner that maximizes recoveries for creditors, and that premise would be severely undermined if the Court does not provide for the waiver of Liquidation Sale Laws.  Moreover, given the supervision of this Court, the requested waiver will not unduly temper state and local requirements that would otherwise apply to the Liquidation Sales; the Debtor only requests that this Court authorize the Debtor and/or the Store Liquidation Agent(s) to conduct the Liquidation

Sales without the necessity of, and the delay associated with, obtaining various state licenses or permits; observing state and local waiting periods or time limits; and/or satisfying any additional requirements with respect to advertising, conducting the Liquidation Sales as a store closing or going out of business or similar type sales, or transferring merchandise to or between the Debtor's stores. The Debtor fully intends to be bound by and comply with remaining statutes and regulations, such as health and safety laws.

55.     The Debtor also requests that no other person or entity, including, but not limited to, any lessor or federal, state or local agency, department or governmental authority, be allowed to take any action to prevent, interfere with, or otherwise hinder consummation of the Liquidation Sales, or the advertising and promotion (including through the posting of signs) of such Liquidation Sales.

56.     Accordingly, the Debtor requests authority to conduct the Liquidation Sales without the necessity of, and the delay associated with, complying with Liquidation Sale Laws including satisfying any additional requirements in connection therewith with respect to advertising and conducting the Liquidation Sales as a store closing or similar type sale and the transfer of merchandise to or between the Debtor's stores. For the reasons set forth above, the Debtor believes that the proposed Liquidation Sales provide the most efficient means of maximizing the value of the merchandise for the benefit of the Debtor's estate and creditors while limiting administrative costs.

### D.      **Store Level Employee Incentive Programs**

57.     Through this Motion, the Debtor seeks authority to execute a negotiated form of the Agency Agreement, which will provide that the Store Liquidation Agent is obligated to pay payroll, benefits and payroll taxes for all store employees used in conducting the Liquidation

Sales ("Store Level Employees").  The Agency Agreement may also provide for the Store

Liquidation Agent's implementation of an incentive program for certain Store Level Employees.

To the extent that the Store Liquidation Agent will implement the incentive program on the

Debtor's behalf, the Debtor requests this Court's authority to proceed with such a program.

58.     The Debtor believes that implementation of such an incentive program for the

Store Level Employees will maintain the necessary workforce in the Debtor's stores throughout

the duration of the Liquidation Sales and will maximize employee morale and also will promote

the success of the Liquidation Sales for the benefit of the Debtor, its estate, creditors and

employees.   Moreover,  since  the  expense  of  the  incentive  program  for  the  Store  Level

Employees will be entirely borne by the Store Liquidation Agent, it will not be a direct expense

of the Debtor's estate.  Accordingly, the Debtor believes that the proposed incentive plan for

Store Level Employees as contemplated by the Agency Agreement is amply warranted under

11 U.S.C. §§ 105(a) and 363.

## V.  <u>LIMITATION AND SHORTENING OF NOTICE</u>

59.     Rules 2002(a)(2) and 6004(a) of the Federal Rules of Bankruptcy Procedure

require that notice of a proposed sale of substantially all of a debtor's assets be sent to all

creditors.  However, the creditor matrix that the Debtor filed in its case lists over 1300 creditors.

60.     In order to eliminate the administrative expense that notice of the proposed sales

of the Debtor's Assets to all creditors would otherwise necessitate, the Debtor requests that this

Court exercise its authority under Fed. R. Bankr. P. 2002(a)(2), 2002(i) and 9007 to limit notice

of the final hearing on the proposed sale of the Assets to the following persons: (i) counsel to

the Prepetition Lenders; (ii) the Subordinated Agent; (iii) counsel to the United States Trustee;

(iv) the Committee and its counsel; (v) all entities reasonably known by the Debtor to have an

Interest in the Assets to be sold; (vi) the creditors identified on the Debtor's list of creditors

holding the twenty largest unsecured claims; (vii) all parties to Designated Agreements, provided, however, that notice to such entities should be permitted in accordance with the specific procedures outlined herein and service shall be deemed sufficient if to their counsel or their designees where an entry of appearance has been made; (viii) the Debtor's landlords; (ix) the Attorneys General of each State in which one of the Debtor's operating stores is located; (x) the municipalities for each operating store location; and (xi) all parties that have obtained orders requiring such notices, motions and other papers to be served upon them. Moreover, in light of the urgency underlying this Motion and the corresponding need for the Debtor to consummate the Sales, as set forth above, the Debtor further requests that this Court exercise its authority under Fed. R. Bankr. P. 2002(a)(2), 2002(i), 9006 and 9007 to shorten applicable notice periods to accommodate the Sales timeframe specified herein.

## VI.  **CONCLUSION**

WHEREFORE, the Debtor respectfully requests that the court enter orders substantially in the forms annexed hereto: (i) approving the Bidding Procedures and the Bid Protection, (ii) authorizing the Debtor's sale of the Assets free and clear of liens, claims and other Interests; (iii) authorizing the Debtor's assumption and assignment of the Designated Agreements; (iv) authorizing the Liquidation Sales contemplated herein; (v) limiting and shortening notice as requested herein; and (vi) granting such other and further relief as is just and proper.

Dated:  June 13, 2006                                   Respectfully submitted,

                                                        Bachrach Clothing, Inc.

Robert M. Fishman (#3124316)
Peter J. Roberts (#6239025)                             By:   /s/ Peter J. Roberts_____
Allen J. Guon (#6244526)                                      One of its attorneys
Shaw Gussis Fishman Glantz
   Wolfson & Towbin LLC
321 North Clark Street, Suite 800
Chicago, Illinois 60610
(312) 541-0151  telephone
(312) 980-3888  facsimile